# The Pennsylvania Railroad Company *v.* The Public Service Commission.

*Railroads—Trains—Act of June 19, 1911, P. L. 1053 (Full Crew Law)—Operation.*

A train consisting of two engines, twenty-six freight cars and a caboose, operating along a branch line under orders of a train dispatcher, is a train within the provisions of the Act of June 19, 1911, P. L. 1053 (Full Crew Law). The fact that such train, during the course of its run, operated on a branch line which was closed against other traffic while the train was on it, does not divest it of its original character.

Nor was the nature of the movement changed when the train of twenty-six cars was split into two sections for the purpose of leaving empty cars on various sidings on the branch line and picking up loaded cars therefrom. Splitting up a train and crew, and separately operating the parts over the road under conditions where neither air, hand or oral signals were available to the conductor who accompanied one part, or observable by the members of the crew who accompanied the other part, introduces the very element of danger which the legislature attempted to provide against, by requiring train crews to consist of certain numbers and classes of employees.

To separate a train crew into two parts, neither of which has the full number of men required by the act of assembly, destroys the coöperative support and vigilance which lead to safety of operation, and constitutes a violation of the act.

Argued November 20, 1919.   Appeal, No. 280, Oct. T., 1918, by the Pennsylvania Railroad Company from the report and order of the Public Service Commission Complaint Docket No. 1739, on complaint of the Brotherhood of Railroad Trainmen and George B. Rowand, against the Pennsylvania Railroad Company.   Before ORLADY, P. J., PORTER, HENDERSON, HEAD, TREXLER, KELLER and LINN, JJ.   Affirmed.

Complaint for violation of the Act of June 19, 1911, P. L. 1053.   The complaint alleged that on the 20th day of September, 1917, the Pennsylvania Railroad Company

ran and operated a certain freight train consisting of twenty-five freight cars from Boyer Run Junction over the Boyer Run Branch with a crew of four men, contrary to the provisions of section 2 of the Act of June 19, 1911, P. L. 1053. The answer of the Pennsylvania Railroad Company admitted the facts contained in the complaint, but denied that a train was run or operated in violation of section 2 or of any other section of the Act of June 19, 1911.

The commission found in favor of the complainant, namely, that the respondent on September 20th, 1917, operated a freight train over its road in violation of section 2 of the Act of June 19, 1911, and issued the following order:

This matter being before the Public Service Commission of the Commonwealth of Pennsylvania upon complaint and answer on file, and having been duly heard and submitted by the parties, and full investigation of the matters and things involved having been had, and the commission having on the date hereof, made and filed of record a report containing its findings of fact and conclusions thereon, which said report is hereby approved and made a part hereof:

Now, to wit, July 30, 1918, the Pennsylvania Railroad Company is hereby ordered to cease and desist from operating freight train No. Extra 2179, specified in this complaint, or by whatever other train designation is given it, consisting of less than thirty (30) freight or other cars, exclusive of caboose and locomotive, over its road, between Youngwood and Boyer Run Junction on the Sewickley Branch, and between Boyer Run Junction and Hecla on the Boyer Run Branch of its railroad system, without a train crew consisting of the statutory number of five (5) persons, to wit, one engineman, one fireman, one conductor, one flagman and one brakeman, as more fully set forth in the above mentioned report of the commission.

131, (1920).] Assignment of Errors—Opinion of the Court.

*Errors assigned* were various findings of fact, and the order of the commission.

*Charles H. Bergner,* and with him *J. E. B. Cunningham* and *Francis I. Gowen,* for appellant.—The movement on the Boyer Run Branch was a shifting movement and did not come within the provisions of the Full Crew Act: Order of Railroad Conductors v. Pittsburgh & Lake Erie R. R. Co., 4 Pa. Corporation Reporter 62.

*William N. Trinkle,* of *Bell, Trinkle & Deeter,* for appellee.—The movement was a train movement and within the provisions of the act: United States v. Erie R. R. Co., 237 U. S. 402; United States v. Chicago, Burlington and Quincy R. R. Co., 237 U. S. 410.

The act is a remedial statute and entitled to a liberal construction: Pennsylvania R. R. Co. v. Public Service Commission, 67 Pa. Superior Ct. 569; Public Service Commission v. B. & O. R. R. Co., 260 Pa. 323; Johnson v. Southern Pacific R. R. Co., 196 U. S. 1; Chicago, etc., R. R. Co. v. Vœlker, 129 Fed. 522; U. S. v. Winn, 3 Sumn. 209; Federal cases, 16740; Howes Brothers v. Dolan, 9 Pa. Superior Ct. 586; Com. v. Shaleen, 215 Pa. 595.

Opinion by Keller, J., February 28, 1920:

This is an appeal from an order of the Public Service Commission on a complaint alleging a violation by the appellant of the provisions of the Act of June 19, 1911, P. L. 1053, commonly known as the "Full Crew Law."

The complaint averred that on September 20, 1917, the appellant operated a freight train consisting of a locomotive, caboose, and twenty freight cars from Boyer Run Junction over the Boyer Run Branch with a crew of only four men, viz, an engineman, a fireman, a conductor and a brakeman, contrary to the provisions of section two of said act, which fixes the minimum crew of such a train at five men.

The Boyer Run Branch is a branch railroad operated by the appellant company southwardly from Boyer Run Junction for a distance of two and seven-tenths miles. It is a single track road devoted wholly to freight traffic, and intended to serve the needs of six coke operations located along its line and connected therewith by extensive sidings, and having numbered station designations for delivery purposes. Two freight stations are located on this branch, at Udell and Hecla, respectively. Its southern terminus is near the plant of the Mt. Pleasant Coke Works; at its northern, Boyer Run Junction, it connects with the Sewickley Branch of the appellant company, which in turn connects with its Southwest Branch at Youngwood, where the appellant maintains a yard.

The facts in evidence are not disputed. A train was made up in the Youngwood yard consisting of two engines, twenty-six empty freight cars and a caboose, in the following order: Engine 662 headed south pulling, caboose, twenty-six freight cars, engine 2179 headed north pushing. The crew consisted of eight men, viz, two engine crews, conductor, flagman and two brakemen. The train ran as an extra, (that is, not on the time table), but left every morning at about the same time, under orders from the train dispatcher at Youngwood to the conductor, directing him to run from the end of the Youngwood yard to or beyond Hecla, and return to Boyer Run Junction. When the train entered the Boyer Run Branch the conductor was to call up the dispatcher at Youngwood, who would close the branch to other trains, while the empties were being delivered on the sidings of the various coke plants and loaded cars hauled out on the main track; and when the conductor had delivered all his empties and arrived at Boyer Run Junction with his train of loaded coke cars, he was again to call up the dispatcher at Youngwood for further orders before going out on the Sewickley Branch and proceeding to the Youngwood yard.

For the purpose of making easy deliveries of the empties at the several sidings, not all of which face the same way, the train was split into two at Boyer Run Junction; engine 662 pushing eight cars intended for Mt. Pleasant Coke Works, and pulling the caboose and twelve cars going to the Hecla Works, went to the southern end of the branch, while engine 2179 delivered six cars to the Marion, Boyer and Veteran Works, located at the junction end, the two trains or sections being at times distant from each other possibly a mile and a half to two miles and not in sight of each other. The crew was likewise divided, the conductor and one brakeman going with engine 662, and the flagman and a brakeman with engine 2179. The operation complained of was the movement of the train composed of the engine, caboose and twenty cars from Boyer Run Junction to Hecla and Mt. Pleasant Works, with a crew of only four men.

The question presented to this court is, was this the operation of a train over the road or any part of the road of the appellant? This naturally divides itself into two: (1) Is the Boyer Run Branch a railroad or part of a railroad? (2) Did the movement of the engine and cars over this branch complained of constitute a freight train?

(1) It can scarcely be contended that the Boyer Run Branch is a switching yard or classification yard. It is a regular branch railroad, operating a single track, controlled by block signals, with two freight stations. The sidings leading into the various coke operations are not located on the right-of-way of the railroad company and do not belong to it. They no more convert a single track railroad into a switching yard than they would have like effect if located along the main line of the appellant company. The length of its line or the fact that it is devoted solely to the movement of freight is not material. The Atglen and Susquehanna Branch of the appellant, ordinarily known as the Low Grade

Line, likewise carries nothing but freight, but the widest stretch of the imagination would not call it a yard. Nor is this railroad made a switch yard pro tempore by the promise of the train dispatcher at Youngwood that the train would be protected while on the Boyer Run Branch from any other train. The character of a railroad company's line of road, and the applicability of the Full Crew Law thereto cannot be made to depend on the promise of a train dispatcher. We have no doubt that the Boyer Run Branch is a railroad within the meaning of the act.

(2) The other question is somewhat more difficult. The appellant's contention is that the movement of the engine, caboose and twenty cars from Boyer Run Junction to Hecla and Mt. Pleasant Works was not a train but merely a switching operation, and not within the purview of the Full Crew Law. At the outset it must be remembered that our act makes no exemption or exception with respect to switching operations. It does not even impliedly do so, as is the case with the Indiana statute along the same lines (Act of Feb. 13, 1907, ch. 11, p. 18), which only applies to railroads "outside of the yard limits." But the Public Service Commission, following the construction placed by the Supreme Court of the United States on various airbrake and safety appliance statutes, (U. S. v. Erie R. R. Co., 237 U. S. 402; U. S. v. C. B. & Q. R. R. Co., 237 U. S. 410,) has held, and rightly so in our opinion, that it is impracticable to enforce the provisions of the Full Crew Law literally while the company's employees are engaged in sorting and switching operations in a yard for the purpose of making up a train to go out on its road, or in breaking up a train after it has completed its run and distributing the cars on its tracks preparatory to assembling them again into trains. For example, cars are placed in a train in a certain order for convenience, so that they may be cut off at certain stations or sidings with the least effort and delay. In order to secure this order, an

engine may have to make a number of trips back and forth in a yard with only one or two cars, while the balance of the train is stationary and receiving the additions thus brought from time to time. It would be impracticable and unreasonable to construe the act so as to require a full crew of five men to be stationed on an engine and car every time such a car was shifted so as to make up a train. But as soon as the train is made up and ready to begin its run, the crew required by the act must be present before the train can move on its run. The switching operations exempted by this ruling were all made in the Youngwood yard. The cars were so gathered and arranged there that certain numbered cars should go to Mt. Pleasant Works and certain cars to Hecla, etc. When they left Youngwood yard it was undoubtedly a train. That it was made up of empties is of no moment. A train does not lose its character as such because it hauls no loaded cars. From the time it left the Youngwood yard, it was, like any other train, subject to the orders of the train dispatcher, while until the train was made up, the conductor took his orders from the yard master. If this train of twenty-six cars had run straight through from Youngwood yard to the terminus of the Boyer Run Branch, no one would seriously contend that it was not a train, within the meaning of the Full Crew Law, from the time it left the yard until it arrived at its destination. We are unable to accede to the proposition that it lost its character as a train at Boyer Run Junction because six cars were there cut off and the position of some of the remaining cars shifted to facilitate delivery at the sidings, so that eight were placed ahead of the engine and twelve were behind it. The position of an engine in a train has no effect upon its character as a train. It may be in front or at the rear or midway without affecting the status of the train. The purpose of this run was to deliver empty cars at these two coke plants and bring back loaded cars; it was not to sort or shift or arrange the cars

preparatory to a run.  Hence when the train got to
Hecla, it left the twelve cars consigned to that point on
the siding belonging to the works there, and then went
on to Mt. Pleasant Works and ran the eight cars con-
signed there onto that siding.  It then picked up such
loaded cars there as the conductor had been instructed
from Youngwood to take, backed down to the Hecla sid-
ing, got the loaded cars which were ready there, pulled
out of the siding onto the main track and backed down
the road to the junction where the two engines were re-
united into one train, and after receiving orders from
the train dispatcher, made the run to the Youngwood
yard in exactly the reverse order from that in which they
originally left the yard.  While the purpose of the train
was to deliver empties to two coke works and haul
loaded cars from those works to the yard, the operation
was no different from that of a local freight train be-
tween two points on the main line, which leaves with a
train of cars, delivers some empties at various station
sidings along its line, and takes on loaded cars waiting
there to be forwarded, and repeats the process until
it arrives at the terminal yard where the cars are sorted
and classified for further shipment.  It was not a
switching operation such as rendered it impracticable
to have a full crew to operate it, but a train within the
contemplation of the Act of 1911.  That it switched
some cars onto the sidings at Hecla and Mt. Pleasant
did not destroy its character as a train when it was
running on the main track of the branch.  If it was a
train at any time during the trip from the junction to
the terminus, the act applies; it was not affected by the
fact that it may have done some switching at the sidings:
Public Service Commission v. B. & O. R. R. Co., 260 Pa.
323.  Nor were the provisions of the act complied with
by having a flagman and a brakeman a mile and a half
to two miles away with engine 2179 and the cars which
it was hauling.  The commission said very aptly on
this point: "Splitting up a train and crew in the man-

ner evidenced in this case, separately operating the parts over the road under the conditions as disclosed, where neither air, hand or oral signals were available to the conductor who accompanied one part, or observable by the members of the crew who accompanied the other part, introduces the very element of danger which the legislature foresaw and attempted to provide against by requiring train crews to consist of certain numbers and class of employees.   To separate a train crew as in the instant case destroys the coöperative support and interdependent vigilance which lead to safety of operation.   If it can be lawfully permitted here, why may not the separate sections of passenger trains be similarly manned, with one conductor in charge of both and each accompanied by a partial crew?"

We were much impressed by the argument of the able counsel for the appellant, and have given the case the full consideration which it merited, but are not satisfied that the order of the commission was erroneous.

The order is affirmed at the costs of the appellant.